[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
BACKGROUND
On September 4, 1998, the commissioner of children and families, (hereinafter sometimes "petitioner") filed neglect petitions alleging that Michael and Eileen, were being permitted to live under conditions, circumstances or associations injurious to their well-being. General Statutes § 46b-120 (8)(B). The respondent mother, KD, and the respondent father, SD, entered denials. The attorney for the children filed motions to strike the petitions claiming they were legally insufficient and failed to state claims upon which relief could be granted. The motions were granted. Upon appeal from the judgments by the petitioner, the Appellate Court reversed the judgments and remanded the case for further proceedings. In re Michael D., 58 Conn. App. 119
CT Page 2999 (2000).
A trial commenced on both petitions on May 18, 2001. The adjudicatory phase of the trial was heard on May 18, 2001, June 7, September 21, and concluded on October 11, 2001. See Practice Book Section 33-3(a). The only issue to be decided by the court is whether at the time the petitions were filed the children were neglected as alleged. On adjudication, the court is limited to events preceding the date of the petition. Practice Book Section 33-3(a). The burden to substantiate the allegations of neglect in the petition rests with the petitioner. Practice Book Section 33-4. That burden must be sustained by a preponderance of the evidence. Practice Book Section 34-3(b).
Having heard the testimony and reviewed the pleadings and exhibits, the court has concluded, based on the facts found and for the reasons set forth below, that the petitioner proved by a preponderance of the evidence that as of the filing of the petition on September 4, 1998, Michael and Eileen were neglected as alleged. In reaching that conclusion, the court has considered only those events and the respondents' conduct or lack thereof which took place prior to September 4, 1998. The court issued notice of its adjudication on February 7, 2002 and indicated that this memorandum of decision would follow.
FINDINGS OF FACT
The respondent mother's two children from a previous marriage, Sean, and Erin, lived with the respondents after their marriage. The family's contact with the department of children and families (hereinafter" DCF") began in 1989 when it was found that SD had physically abused Sean. Sean had bruises and scratches as a result of physical abuse of him by SD. The case was closed when the family complied with treatment services. The family attended counseling sessions for two years.
For a period of about eight years, commencing when Sean was about eight years old, SD sexually abused his stepson almost daily in the mornings before he went to school. The abuse occurred mainly after KD, a nurse, had gone to work. The abuse occurred while the respondents' two children, Michael and Eileen, were in the home. SD would sexually fondle Sean, rub lotion on his naked body and on occasion digitally penetrate Sean's anus. When Sean grew older, he asked SD to stop. SD would promise never to do it again, but after a few months, he would resume the abuse.
In March 1996, when Sean was sixteen years old, he told his mother, KD, that SD had that day removed his clothing. SD acknowledged to KD that he had pulled down Sean's pants. KD took no action at that time. A few weeks later she told Sean that it was just a one time occurrence and bad CT Page 3000 things happen to people. KD did not seek counseling for Sean or for anyone else in the household. She did not require SD to leave the home.
In September 1997, Sean told his mother that the abuse by SD was not a one time occurrence, that it happened all the time and that the abuse had started a year or two after her marriage to SD. When KD asked if this were true, SD responded affirmatively and apologized.
In September 1997, after learning of the sexual abuse. KD told Sean that she was trying to get all of the assets signed over to her. She told Sean that he had until he was 35 years old to sue SD and that he should wait until Michael, who was then three years old, turned 18. KD did not ask SD to move out of the house. KD, a nurse, did not report the allegations of sexual abuse to police or seek counseling for Sean, Erin, or for Michael and Eileen.
In January 1998, KD set up an appointment for Sean with a social worker. On January 30, 1998, Sean's therapist reported to DCF that Sean had disclosed sexual abuse by SD. During the DCF investigation that followed, Erin denied sexual abuse, but moved, as did Sean, to her biological father's home because she did not feel safe in the respondents' home. Eileen, who was eight years old, denied sexual abuse by SD. The DCF investigator, Bruce Wrobel, was unable to interview three year-old Michael because he was borderline verbal. RD told the investigator that she was aware that Sean reported sexual abuse by his stepfather. RD acknowledged to Wrobel that, as a nurse, she is a mandated reporter. KD told the investigator that she did not report the abuse because she wanted to wait until Sean was 18 years old so he could make his own decision whether he wanted to report it.
In February 1998, Wrobel addressed the safety of the children with RD. RD told the investigator that she would protect the children, that she was divorcing SD, that he was out of the home, and that she was seeking full custody of the children. RD signed a service agreement with DCF in which she agreed that she would not allow unsupervised contact between the children and SD. The service agreement was signed by RD on March 2. 1998. and was to remain in effect until notification by DCF. RD agreed with Wrobel that SD would remain out of the home and that he would not have unsupervised contact with the children. Based on those representations, DCF closed the case in March of 1998.
Three months later, on June 11, 1998, RD's attorney inquired of Wrobel if the service agreement was going to be rescinded; Wrobel's supervisor said that it would not be rescinded. Given that inquiry, RD knew that the service agreement was to and had remained in effect after the case was closed in March 1998. CT Page 3001
On August 28, 1998, DCF received a report that SD had moved back into the home. Angelique Pearson, a DCF investigator went to the respondents' home and spoke with SD who was living there along with RD, Michael and Eileen. SD told the investigator that he was in counseling and that RD and the children were also in counseling at an agency that deals with anxiety and depression. None of the counselors were sexual offender counselors.
On August 31, 1998, Pearson met with RD and her attorney at the home. SD was also present. The investigator told RD that she needed to supervise the children while SD was present. RD stated that she did supervise the children although she did not see a need to do so because she did not believe her husband had abused Sean. Eileen went to a neighbor's house before school and after school. Michael told Pearson that his mother mostly watches him and that his daddy sometimes watches him. The investigator advised SD that he should get therapy from a sex offender therapist.
William Hobson, a psychologist specializing in treatment of sexual offenders provided credible, reliable and persuasive testimony upon which the following findings are made:
Sexual offender therapy is an important component of treating and supervising sex offenders. It raises their accountability to the offense, and it prevents the chance of recidivism of which there is always a risk.
If the offender wishes to have contact with minors it must be supervised by an effective supervisor. To be effective, the supervisor needs to participate in a family education program to establish that the supervisor is aware of the offense details and believes that it occurred. If the supervisor does not believe that the person offended, then he or she does not believe there is any risk of it happening in the future.
The supervisor needs to be willing and able to confront the offender when red flags become evident. There needs to be some equality in the relationship; the supervisor cannot be cowed by or dependent upon the offender.
The supervisor needs to be willing and able to share information with the professionals even if it is to the detriment of the partner who is offending.
The supervisor needs to be, first and foremost, dedicated to the safety CT Page 3002 of and the protection of the children involved even when it is to the supervisor's own detriment.
As of the date of the petition, the father had not sought or obtained appropriate or adequate rehabilitative services for his sexual abuse of a child living in his home and under his care. As of the date of the petition, the mother had not sought or obtained appropriate or adequate rehabilitative services for herself or her children before allowing SD in the home. As of September 4, 1998, neither parent had appreciated or accepted the need to safeguard their children and neither parent had raised the protection and well being of Michael and Eileen higher than his or her own needs, desires or self interest.
SD had sexually abused his stepson for more than eight years, even during two years of family counseling he had undergone after his physical abuse of Sean in 1989. Despite his promises to stop abusing Sean, he was unable to stop and did not stop until Sean had made the first revelation to RD. In March of 1996, SD told RD only that he pulled down the pants of his 16 year-old stepson. Until Sean made his second revelation to RD, the respondent father concealed that he had been sexually abusing Sean, a child living in the repsondents' home for years.
In March 1996, after Sean's first revelation of abuse, RD minimized the event and SD continued to conceal his longstanding abuse of Sean. Even in the face of Sean's second revelation and her husband's belated acknowledgment that the sexual abuse of Sean had occurred numerous times over a period of years rather than just once, RD did not keep him out of the home and away from Sean and the other children. She did not obtain counseling for her abused child or the other children; she did not obtain professional help to investigate with whom and to what extent abuse had been going on in the home. She counseled Sean to hold off from any lawsuit until Michael became 18 years of age. She did not report the abuse to the police. She did not obtain protective orders. She told Sean she was going to see a lawyer about a divorce and was going to make sure her assets were protected. Within a few months of her agreement with Wrobel, however, RD was inquiring about rescinding the service agreement with DCF, and sometime shortly thereafter, SD was back in the home living with RD, Eileen and Michael. Even after SD's acknowledgment of the abuse to her, RD did not see the need to supervise Michael and Eileen during SD's presence because she did not believe Sean.
The attorneys for the respondents and the children argue that there is no evidence that Michael or Eileen were ever abused by or were ever at risk from SD. They argue that in the absence of evidence of injury, a finding of neglect in this case must be based on speculation. In support of this position they rely on a letter dated September 1, 1998, from the CT Page 3003 children's physician which states,
 During the course of my care of my patients: [Michael], [Eileen], [Erin], and [Sean], I have never seen evidence of any abuse or neglect. They have been well cared for by their parents, [KD] and [SD].
They also rely on a letter from the children's therapist to DCF with a transmittal date of June 2, 1998, which states,
 [RD] brought her children to therapy to deal with the family situation and to try to determine if her two remaining children had been sexually abused. I have not had any evidence by either E or M that there has been any sexual abuse. [KD] has made me aware of the allegations of sexual abuse against her husband by her older son. . . . (emphasis supplied).
There is no probative value to the physician's statement that he has "never seen any evidence of abuse or neglect" since Sean at least had, in fact. been sexually abused for years. As for the therapist's letter, its significance lies not in her lack of evidence of sexual abuse from the children, but in KD's making the therapist aware of the "allegations of sexual abuse against her husband" by Sean in light of KD's knowledge that the sexual abuse had, in fact, taken place.
Under the facts of this case, the court does not need to "speculate" that Michael and Eileen "would be" abused by their father in the future or that they "would be" neglected by their mother in the future. A child may be found "neglected" if that child "is being permitted to live under conditions circumstances or associations injurious to his well-being." Sec. 46b-120 (8)(C). The term "injurious" does not require infliction of an actual injury; rather, it is defined in Webster's Third New International Dictionary as "inflicting or tending to inflict injury." An adjudication of neglect does not require actual harm. In re Michael D.,58 Conn. App. 119, 124-25 (2000).
As of the date of the petition, SD was an admitted sexual offender of a child. He posed a risk of re-offending — whether a high risk or a low risk, he posed a risk of reoffending. He was not involved in sexual offender therapy and had not undergone sexual offender therapy. RD was not involved in and had not undergone therapy for a partner of a sexual offender. KD was not an effective supervisor of a sexual offender.
As of the date of the petition. Michael and Eileen. ages four and 10 respectively, were living with a father who was a known sexual abuser and CT Page 3004 who posed a risk of re-offending. Michael and Eileen were living with a mother who would not or could not effectively supervise the offender and protect them from that risk. Those conditions, circumstances and associations existed from at least March of 1996 and continued, except perhaps for the few months that SD was out of the home, to September 4, 1998. Those conditions, circumstances and associations were injurious to Michael and Eileen's well-being.
CONCLUSION
As of the date of the petition, Michael and Eileen were neglected because they were being permitted to live under conditions, circumstances and associations injurious to their well-being.
A dispositional hearing will be held on Friday, March 15, 2002 at 10:00 a.m.
Tanzer, J.